UNITED STATES DISTRICT COURT
DISTRICT OF RHODE ISLAND

| | | |
|---|---|---|
| JOSEF GORRES | : | |
| | : | |
| v. | : | C.A. No. 04-319T |
| | : | |
| THE UNIVERSITY OF RHODE ISLAND and THE RHODE ISLAND BOARD OF GOVERNORS FOR HIGHER EDUCATION | : | |

**REPORT AND RECOMMENDATION**

Lincoln D. Almond, United States Magistrate Judge

**Introduction**

Before this Court are Defendants' Motions for Summary Judgment (Document Nos. 44 and 53) pursuant to Fed. R. Civ. P. 56 and Defendant The University of Rhode Island's ("URI") Motion to Dismiss (Document No. 50) pursuant to Fed. R. Civ. P. 12(b)(6). In his Amended Complaint, Plaintiff Dr. Josef Gorres ("Plaintiff") alleges four counts of employment discrimination based on his age (forty-seven), gender (male) and nationality (German), in violation of the Rhode Island Fair Employment Practices Act ("FEPA"), R.I. Gen. Laws § 28-5-1 et seq. (Count I); the Rhode Island Civil Rights Act of 1990 ("RICRA"), R.I. Gen. Laws § 42-112-1, et seq. (Count II); the Age Discrimination in Employment Act of 1967 ("ADEA"), 29 U.S.C. § 621, et seq. (Count III); and Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e et seq. (Count IV).

This matter has been referred to me for preliminary review, findings and recommended disposition. 28 U.S.C. § 636(b)(1)(B); L.R. Cv 72(a). A hearing was held on January 19, 2006. After reviewing the memoranda submitted, listening to the arguments of counsel and conducting

independent research, I recommend that Defendants' Motions for Summary Judgment be GRANTED in part and DENIED in part, and URI's Motion to Dismiss be DENIED.

**Statement of Facts**

The following undisputed facts are culled from the parties' Local Rule 12.1(a) Statements.

**A. Background**

Plaintiff is a male German national. Pl.'s Aff. ¶¶ 1 and 2. Plaintiff was forty-seven years old at the time of the challenged employment decision. See Document No. 53, Ex. A, ¶ 3. Plaintiff was originally hired by URI as a full-time lecturer in 1992. Pl's Aff., ¶ 3. In 1994, Plaintiff was promoted to the position of Assistant Research Professor in URI's Department of Natural Resources Science ("NRS"). Id., ¶ 4. Plaintiff was later promoted in 1999 to the position of Associate Research Professor. Id., ¶ 5. Plaintiff currently works in the area of soil ecology. Plaintiff is a doctoral physicist.

NRS is one of ten academic departments comprising the College of the Environment and Life Sciences ("CELS") at URI. CELS has been headed by Dean Jeffrey R. Seemann since he arrived at URI in 2001. During the time period relevant to this case, NRS was chaired by Dr. Thomas P. Husband.

**B. The Position**

In 2001, URI decided to fill a position for a Terrestrial Biogeochemist in the NRS Department which had been vacant since 1999. Deposition of Prof. Husband, pp. 8-11; Am. Compl., ¶ 15. The position was advertised with an application deadline of May 3, 2002. Pl.'s Ex. F. Plaintiff submitted a timely application for the position in April 2002. Am. Compl., ¶ 16.

### C. The Search

The general process of hiring a tenure-track professor at URI includes an identification of need within the academic department which is communicated to the College's Dean. URI's Local R. 12(a) Statement of Undisputed Facts, ¶ 2. Next, the Dean makes a request to the University Provost for approval of the position. Id. If the Provost approves the position, a search process is commenced, and the Department Chair makes a recommendation to the Dean regarding the composition of a Search Committee. Id. Once composed, the Search Committee develops a position description and advertisement subject to approval by the Dean and the Affirmative Action Office ("AAO"). Id. The Search Committee then accepts and reviews applications to narrow the field for on-campus interviews. Id. After such interview, the Search Committee meets and makes either a hiring recommendation to the Dean or a recommendation to close the search. Id. Such recommendation is subject to AAO approval prior to consideration by the Dean. Id.

In this case, the Search Committee was chaired by Dr. Jose Amador of the NRS Department and included Dr. Arthur Gold, Department of NRS; Dr. Mark Stolt, Department of NRS; Dr. Alison Roberts, CELS-Department of Biological Sciences; and Dr. Keith Killingbeck, CELS-Department of Biological Sciences.[1] The Search Committee narrowed the field to five candidates for phone interviews. Those five were the Plaintiff, Dr. Mark David, Dr. John Schade, Dr. Emily Bernhardt and Dr. John Barrett. A sixth candidate, Dr. Grogan, declined a phone interview because he had already taken a position elsewhere. Pl.'s Ex. G. Following the phone interviews, each Search Committee member ranked their top three candidates for on-campus interviews. Id. The rankings

---

[1] The Search Committee also included another NRS Department faculty member, Dr. Kim Brosofske who left URI and thus the Committee during the search process.

were weighted, and the top three candidates were Plaintiff (nine points), Dr. David (eight points) and Dr. Schade (seven points). Id. Dr. Bernhardt (six points) and Dr. Barrett (zero points) were not selected for on-campus interviews. Id. On November 20, 2002, the Search Committee sought permission from the AAO to interview these three finalists. Id. Permission was denied by the AAO on November 22, 2002. Id.

The Search Committee quickly went back to the drawing board and submitted new rankings to the AAO on November 26, 2002. Pl.'s Ex. H. It does not appear that the Search Committee conducted any additional interviews or consideration of the particular candidates. Rather, instead of the weighted ranking system applied in the rejected process, the Search Committee ignored the second and third place rankings, and "decided to interview only those candidates that were ranked #1 by committee members." Id. This resulted in a final three – Plaintiff, who was ranked first by Dr. Amador; Dr. David, who was ranked first by Dr. Gold and Dr. Stolt; and Dr. Bernhardt, who was ranked first by Dr. Killingbeck and Dr. Roberts. Id. In effect, Dr. Bernhardt, the only remaining female candidate, leapfrogged Dr. Schade into the final three. Id. The revised submission was approved by the AAO on the same day it was submitted. Id.

After on-campus interviews of the three finalists were completed, the Search Committee met with NRS Department faculty to discuss and rank the finalists. Pl.'s Ex. I; Amador Dep. at pp. 29-31. A secret ballot vote resulted in the following ranking: first, Dr. Bernhardt; second, Plaintiff; and third, Dr. David. Pl.'s Ex. I. However, it was noted that NRS faculty "found all three candidates to be acceptable for the position." Id. On December 24, 2002, these rankings were forwarded to Dean Seemann for his consideration. Id.

On December 30, 2002, a request to hire Dr. Bernhardt for the position was approved and signed by the Search Chair, the Dean's Office, the Provost's Office and the AAO. Pl.'s Ex. O (URI Form AA3). After lengthy discussions with Dr. Bernhardt and proposals to accommodate her spouse with a teaching position at URI, Dr. Bernhardt declined the position at URI in April 2003. Pl.'s Ex. R. On April 18, 2003, Dr. Husband, NRS Chair, thanked Dean Seemann for his "hard work" in negotiating with Dr. Bernhardt and requested that he make an offer to the next candidate on the list, i.e., Plaintiff. Pl.'s Ex. C. Dr. Husband stated that his Department "needs this position filled as soon as possible to support its resident instruction program and research efforts" and described it as an "important position" to the NRS Department. Id. In a prior email to Dean Seemann dated December 27, 2002, Dr. Husband advised that the three final candidates were "all deemed acceptable (unanimous vote) by the NRS Department" and that Plaintiff ranked "a close second" to Dr. Bernhardt. Pl.'s Ex. N. Dean Seemann ultimately closed the search, and neither Plaintiff nor Dr. David were offered the position. Plaintiff was notified of this decision by letter dated May 20, 2003. Pl.'s Ex. S.

**Summary Judgment Standard**

A party shall be entitled to summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). When deciding a motion for summary judgment, the Court must review the evidence in the light most favorable to the nonmoving party and draw all reasonable inferences in the nonmoving party's favor. Cadle Co. v. Hayes, 116 F.3d 957, 959 (1st Cir. 1997).

Summary judgment involves shifting burdens between the moving and nonmoving parties. Initially, the burden requires the moving party to aver "an absence of evidence to support the nonmoving party's case." Garside v. Osco Drug, Inc., 895 F.2d 46, 48 (1st Cir. 1990) (quoting Celotex Corp. v. Catrett, 477 U.S. 317, 325, 106 S. Ct. 2548, 2554, 91 L. Ed. 2d 265 (1986)). Once the moving party meets this burden, the burden falls upon the nonmoving party, who must oppose the motion by presenting facts that show a genuine "trialworthy issue remains." Cadle, 116 F.3d at 960 (citing Nat'l Amusements, Inc. v. Town of Dedham, 43 F.3d 731, 735 (1st Cir. 1995); Maldonado-Denis v. Castillo-Rodriguez, 23 F.3d 576, 581 (1st Cir. 1994)). An issue of fact is "genuine" if it "may reasonably be resolved in favor of either party." Id. (citing Maldonado-Denis, 23 F.3d at 581).

To oppose the motion successfully, the nonmoving party must present affirmative evidence to rebut the motion. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 256-57, 106 S. Ct. 2505, 2514-2515, 91 L. Ed. 2d 202 (1986). "Even in cases where elusive concepts such as motive or intent are at issue, summary judgment may be appropriate if the nonmoving party rests merely upon conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990). Moreover, the "evidence illustrating the factual controversy cannot be conjectural or problematic; it must have substance in the sense that it limns differing versions of the truth which a factfinder must resolve." Id. (quoting Mack v. Great Atl. & Pac. Tea Co., 871 F.2d 179, 181 (1st Cir. 1989)). Therefore, to defeat a properly supported motion for summary judgment, the nonmoving party must establish a trialworthy issue by presenting "enough competent evidence to enable a finding favorable to the nonmoving party." Goldman v. First Nat'l Bank of Boston, 985 F.2d 1113, 1116 (1st Cir. 1993) (citing Anderson, 477 U.S. at 249).

## Analysis

### A. The Parties' Positions

Defendants contend that Plaintiff's discrimination claims are defeated by the undisputed fact that the position was offered to a more qualified candidate, Dr. Bernhardt. In other words, they contend that Plaintiff, as the "second place" finisher was not entitled to the position, as a matter of law, after Dr. Bernhardt declined and URI did not subsequently seek to fill the position. URI further contends that, in any event, it is not a legal entity subject to suit.

Plaintiff contends that genuine issues of material fact are present regarding the reason he was not selected which preclude the entry of summary judgment. Plaintiff does not argue that he was "entitled" to the position after Dr. Bernhardt declined. Rather, Plaintiff argues that URI unlawfully based its decision not to hire him on his gender and/or age. Plaintiff did not address his claim of national origin discrimination in his Memorandum in Opposition and, at the hearing, indicated that he did not oppose the entry of summary judgment on that claim. Finally, Plaintiff asserts that URI is properly named as a defendant in this case.

### B. URI Has the Capacity to be Sued

URI argues, both in its Motion to Dismiss and Motion for Summary Judgment, that it is not a legal entity which may be sued in its own right. URI contends, citing R.I. Gen. Laws §§ 16-32-2 and 16-59-1(a), that URI is only a "fictitious name" and that it is operated by the Board of Governors for Higher Education (the "BOG") which is a legal entity subject to suit.

In response, on September 8, 2005, Plaintiff moved for leave to amend his Complaint to add the BOG as a defendant. The BOG countered by arguing that Plaintiff had failed to exhaust his administrative remedies as to it because only URI, and not the BOG, was named in the charge of

discrimination filed with the Rhode Island Commission for Human Rights.[2] Chief Judge Torres granted the Motion to Amend on October 14, 2005, and the BOG was thereafter added to the case as URI's co-defendant. In addition, Chief Judge Torres issued a subsequent Order dated December 8, 2005 rejecting the BOG's exhaustion defense, presumably due to the close interrelationship between URI and the BOG. See Document No. 59. This is now the law of the case and, even if this Court agreed that URI could not be sued, all of Plaintiff's statutory discrimination claims would proceed against the BOG in any event.

Plaintiff points out that, for decades, URI has repeatedly sued and been sued in both Rhode Island state and federal courts. Plaintiff also points to a 2004 written contract obtained in discovery between URI and a consultant, and argues that it is "disingenuous" for URI to sue, be sued, enter into one and likely many contracts, and then assert it is not a suable entity. This Court agrees.

Although the BOG is responsible under Rhode Island law for the "control, management and operation of" URI, R.I. Gen. Laws § 16-32-2, and is a "public corporation, empowered to sue and be sued in its own name," R.I. Gen. Laws § 16-59-1(a), it does not necessarily follow that URI cannot be sued. URI offers no convincing legal support for its contention that URI is a non-suable "fictitious" or imaginary entity.

Plaintiff alleges that he is employed by URI and that he applied for the open position of Terrestrial Biogeochemist advertised by URI in 2002. URI has offered no contrary evidence under Fed. R. Civ. P. 56(c) suggesting that it is not Plaintiff's employer or not the employer advertising the faculty position in question. The approved advertisement for the vacant position notes that "[t]he University of Rhode Island is an AA/EEO employer and values diversity." Pl.'s Ex. F. Similarly,

---

[2] There is no exhaustion requirement in connection with Plaintiff's RICRA claim – Count II.

several exhibits in this case are on URI stationery that contain the following statement at the bottom of the page: "The University of Rhode Island is an affirmative action and equal opportunity employer." Pl.'s Exs. C, G, H, I, K, S, X, Y, etc. The Request to Hire form (AA3) identifies URI in its title and requires the Search Chair to certify compliance with "the University's Guidelines and Procedures on Affirmative Action and Equal Opportunity." Pl.'s Ex. O. All the approval signature lines on the form are for URI officials. Id. There is no reference to the BOG and no reference to BOG approval on the Request to Hire form. Id. Finally, the "rejection" letter received by Plaintiff was sent on URI stationery and "[o]n behalf of the search committee and the Department of [NRS] at [URI]...." Pl.'s Ex. S. There is no mention of the BOG in this letter. Id.

In support of his position, Plaintiff points to the following state and federal cases involving URI as a party:

> Gorman v. Univ. of R.I., 837 F.2d 7 (1st Cir. 1988); Univ. of R.I. v. A.W. Chesterton Co., 2 F.3d 1200 (1st Cir. 1993); Univ. of R.I. v. A.W. Chesterton Co., 721 F. Supp. 400 (R.I. 1989); Lallemand v. Univ. of R.I., 9 F.3d 214 (1st Cir. 1993); Univ. of R.I. v. Univ. of R.I. Chapter of the Am. Ass'n of Univ. Professors, Rhode Island Superior Court Case No. 2000-5007; Univ. of R.I. v. Dep't of Employment and Training, 691 A.2d 552 (R.I. 1997); Wilkinson v. Univ. of R.I., Rhode Island Superior Court Case No. 2003-0573; Chang v. Univ. of R.I., 375 A.2d 925 (R.I. 1977); Hawksley v. Univ. of R.I., D.R.I., C.A. No. 03-312T; and King v. Univ. of R.I., D.R.I., C.A. No. 02-183ML.

Almost one year to the day prior to the commencement of this action, URI was sued for employment discrimination in this Court by one of its employees under the FEPA, RICRA and the federal Americans with Disabilities Act. See Hawksley v. Univ. of R.I., C.A. No. 03-312T. In its Answer filed on September 15, 2003, URI admitted that it employed the plaintiff and did not, as in this case, plead as an affirmative defense that it is not an entity subject to suit. The case was

ultimately dismissed on February 24, 2005 under Fed. R. Civ. P. 41(a)(2) following a settlement agreement to which URI was a party and signatory independent of the BOG. See Ex. to Document No. 16 in C.A. No. 03-312T. In addition, the Settlement Agreement provided that the plaintiff was free "to make application for any position within URI and that her application will be processed in accordance with the policies and procedures in effect at URI at the time." Id., ¶ 4. A review of the court file in Hawksley v. Univ. of R.I. reveals that URI considered itself a suable entity at that time and an entity with the legal capacity to enter into a binding settlement agreement. URI has not identified any change in its legal status since 2003 which has converted it into a "fictitious," non-suable entity today.

Plaintiff also relies on a contract he obtained from URI during discovery. It is a multi-year consulting contract entered into on May 17, 2004 by "the University of Rhode Island, a public institution of higher education" and signed by a URI Assistant Vice President. Pl.'s Ex. N2. The contract is not signed by a representative of the BOG and does not indicate that it is subject to BOG approval. The contract includes an indemnification provision whereby URI agrees to indemnify the consultant under certain circumstances "where [URI] has been found by a court of competent jurisdiction to have been factually and legally responsible for said condition and loss." Id., § 11.0. If URI could not be sued, this contract language would be meaningless. Further, if URI has the power to make a contract, it also presumably has the capacity to sue or be sued in the event of a claimed breach. See Univ. of R.I. v. A.W. Chesterton Co., 721 F. Supp. 400 (D.R.I. 1989) (URI sued a supplier for $100,000.00 in property damages resulting from URI's use, on its research vessel, of a rust-inhibiting paint product which URI purchased from defendant).

For the reasons discussed above, URI has not convinced this Court that it cannot be sued in its own right. Thus, this Court recommends that the District Court DENY URI's Motion to Dismiss (Document No. 50) in its entirety, and URI's Motion for Summary Judgment (Document No. 44) to the extent that it also relies upon this argument.

**C. Title VII**

Title VII of the Civil Rights Act of 1964 makes it "an unlawful employment practice for an employer...to discharge any individual, or otherwise to discriminate against any individual with respect to his...employment, because of such individual's...sex...." 42 U.S.C. § 2000e-2(a)(1).[3] In this case, Plaintiff does not rely on direct evidence of discrimination or a so-called "smoking gun." Thus, Plaintiff's proof of a Title VII violation is evaluated pursuant to the familiar three-step, burden-shifting framework established in McDonnell Douglas Corp. v. Green, 411 U.S. 792 (1973). See also St. Mary's Honor Center v. Hicks, 509 U.S. 502 (1993); and Tex. Dep't of Cmty. Affairs v. Burdine, 450 U.S. 248 (1981). The First Circuit has thoroughly outlined this framework as follows:

> [STEP ONE] [T]he plaintiff shoulders the initial burden of adducing a prima facie case of unlawful discrimination. This includes a showing that: (1) plaintiff is a member of a protected class; (2) plaintiff's employer took an adverse employment action against him; (3) plaintiff was qualified for the employment he held; and (4) plaintiff's position remained open or was filled by a person whose

---

[3] The same analysis applies to all four discrimination counts contained in Plaintiff's Complaint. See Kriegel v. State of R.I., 266 F. Supp. 2d 288, 296 (D.R.I. 2003) (applying federal analysis to claims under FEPA and RICRA); Russell v. Enter. Rent-A-Car Co., 160 F. Supp. 2d 239, 265 (D.R.I. 2001) ("FEPA is Rhode Island's analog to Title VII and the Rhode Island Supreme Court has applied the analytical framework of federal Title VII cases to those brought under FEPA") (citations omitted); and Burdick v. Fuller Box Co., 2003 WL 21692107 at *2, C.A. No. 02-245T (D.R.I. July 16, 2003) (legal analysis of claims under ADEA, FEPA and RICRA is "essentially identical"). Therefore, this Court will generally refer to Title VII in its analysis, but the analysis will apply as to all of Plaintiff's discrimination claims.

> qualifications were similar to his. Establishment of a prima facie case creates a presumption of unlawful discrimination.
>
> [STEP TWO] Once a plaintiff establishes a prima facie case, the burden [of production, not persuasion,] shifts to the employer to rebut this presumption by articulating a legitimate, non-discriminatory reason for its adverse employment action.
>
> [STEP THREE] In the third and final stage, the burden devolves upon the plaintiff to prove that the reasons advanced by the defendant-employer constitute mere pretext for unlawful discrimination. To meet this burden, the plaintiff must prove not only that the reason articulated by the employer was a sham, but also that its true reason was plaintiff's [gender]....

Smith v. F.W. Morse & Co., 76 F.3d 413, 421 (1st Cir. 1996) (citations and footnote omitted).

**1. Prima Facie Case**

The First Circuit has instructed that "[t]he burden of making out a prima facie case is 'not onerous.'" Mesnick v. Gen. Elec. Co., 950 F.2d 816, 823 (1st Cir. 1991) (quoting Burdine, 450 U.S. at 253). At the hearing, Defendants did not contest that Plaintiff met the first three prongs of his prima facie case. However, Defendants argue that Plaintiff cannot, as a matter of law, meet the fourth prong which generally requires in a failure to hire case that, after the plaintiff's rejection, the position remained open or was filled by hiring another candidate with similar qualifications. See Gu v. Boston Police Dep't, 312 F.3d 6, 11 (1st Cir. 2002). Defendants' argument fails as a matter of fact and as a matter of law.

First, as a matter of law, the prima facie case framework established in McDonnell Douglas was "never intended to be rigid, mechanized or ritualistic." Furnco Constr. Corp. v. Waters, 438 U.S. 567, 577 (1978). See also Cumpiano v. Banco Santander P.R., 902 F.2d 148, 155 (1st Cir. 1990) ("[T]he critical determination in any Title VII suit is whether the complainant has proven by

a fair preponderance of the evidence that an impermissible consideration – say, her gender – was a substantial motivating factor in the adverse employment decision."). In the reverse discrimination context, courts have modified the elements of a prima facie case to serve the purposes of Title VII. See, e.g., Notari v. Denver Water Dep't, 971 F.2d 585, 589 (10th Cir. 1992). For instance, in Eastridge v. R.I. College, 996 F. Supp. 161 (D.R.I. 1998), Senior Judge (then Chief Judge) Lagueux of this Court applied a modified McDonnell Douglas framework to a reverse discrimination claim involving a tenure track faculty position at Rhode Island College ("RIC"). Defendants argue that Eastridge is factually distinct from this case and that Judge Lagueux's legal analysis "does not do true justice" to Supreme Court and First Circuit Title VII precedent. This Court disagrees with Defendant's interpretation of Eastridge in both respects.

The facts in Eastridge are very similar to the facts in this case in several respects. The plaintiff in Eastridge was a white male internal candidate for the position in question. The external candidate initially selected for the position was from a racial group which was underrepresented on the faculty in the academic department in issue. The "first choice" minority candidate declined the job offer. The plaintiff was determined to be qualified and was identified as the "second choice" by the Search Committee. Finally, the search was closed or cancelled after the "first choice"minority candidate declined, and the job was not offered to the "second choice" internal candidate.

Judge Lagueux denied RIC's motion for summary judgment in Eastridge due to the existence of genuine issues of material fact as to whether discriminatory reasons were the basis for RIC's decision to cancel the search after the "first choice" declined the position. He concluded that the outcome of the case turned on the assessment of witness credibility and that the plaintiff had offered sufficient evidence to present a factual dispute "as to whether the decision to cancel the position

was...based on declining enrollments...or...based on affirmative action factors...." Eastridge, 996 F. Supp. at 164. Although the plaintiff did not produce evidence that the position remained open or was filled by a candidate with similar qualifications to plaintiff, Judge Lagueux did not mechanically apply the McDonnell Douglas test and throw out the plaintiff's claim for failing to satisfy the fourth prong of a prima facie case. Rather, he looked at the case in its entirety and determined that the plaintiff had provided sufficient evidence to support an inference of discrimination. See Petitti v. New England Tel. & Tel. Co., 909 F.2d 28, 33 (1st Cir. 1990) ("The fourth prong [of the prima facie case] would require [the plaintiff] to show that he was not hired but for his gender.").

Defendants' proposal to strictly and mechanically apply the fourth prong of the prima facie case test would simply not serve the purposes of Title VII. If this Court accepted Defendants' position, they would arguably be entitled to summary judgment in every case where a search is terminated without making a hire regardless of the circumstances. For example, if Defendants favored hiring someone of a particular race, gender, etc., they could attempt to avoid scrutiny under Title VII by closing the search whenever the favored candidate declined the offer or there were no candidates from the favored class among the finalists. Such a result would be contrary to the intent underlying Title VII. Defendants' argument for strict application of the fourth prong would have more weight if none of the final candidates were offered the position and the search closed. However, in this case, Defendants offered the position to a female candidate and closed the search only after she declined and at a time when the only remaining "finalists" were male. Although this fact alone would generally not be sufficient to support a reasonable inference of gender discrimination, Plaintiff has not based his case on this single fact.

As discussed above, Judge Lagueux in Eastridge did not mechanically apply the fourth prong but rather "quite simply" examined all of the evidence applying Fed. R. Civ. P. 56 to determine if it supported a reasonable inference of discrimination. 996 F. Supp. at 167 (citing U.S. Postal Serv. Bd. of Governors v. Aikens, 460 U.S. 711 (1983)). If the plaintiff in Eastridge had not produced sufficient evidence to support such an inference, Judge Lagueux would presumably have entered summary judgment for RIC. However, having found that the plaintiff made a sufficient showing under Fed. R. Civ. P. 56(e), he concluded that the case had to be decided by the jury. Judge Lagueux's approach is as sound today as it was when he decided Eastridge in 1998, and it does true justice to both the purposes of Title VII and the dictates of Fed. R. Civ. P. 56.

Moreover, in Wiener v. Polaroid Corp., 790 F. Supp. 363, 366 (D. Mass. 1992), Judge (then Chief Judge) Tauro tailored the McDonnell Douglas prima facie case in a Title VII sex discrimination case "so as to require, for the fourth prong, that Plaintiff show that the employer's decision 'occurred under circumstances giving rise to an inference' of discrimination." Although it was undisputed in Wiener that the employer did not continue to seek applicants and never filled the position in issue after rejecting the plaintiff, Judge Tauro applied the "tailored" test and held that the plaintiff was still able to establish a prima facie case of sex discrimination. Id. at pp. 365-366. See also Stokes v. Perry, 1997 WL 782131, No. 94 CIV 0573 (RO) at *5 (S.D.N.Y. 1997) ("where the fourth prong of McDonnell Douglas is literally inapplicable because plaintiff failed to be promoted in a pool hiring situation, the plaintiff, in order to make out a prima facie case of disparate treatment, must show that the employment decision was made under some circumstances which indicate that race was a factor"); and Holmes v. Bevilacqua, 794 F.2d 142, 147 (4th Cir. 1986) (Where "plaintiff cannot prove that the vacancy remained open after he was rejected, he must present

some other evidence that his race was a factor considered by his employer in not granting him the promotion. There must be some evidence that race was a determining factor in the employer's decision").

Second, as a matter of fact, there is a "trialworthy" issue as to whether the position remained open. In Eastridge, RIC argued, in part, that its decision to "cancel the position" after the selected minority candidate declined the position was due to "low and declining" enrollments in that academic department. Defendants in this case do not contend that the search was closed due to declining enrollments or any other economic or budgetary reason. Shortly after Dr. Bernhardt declined the offer, the faculty of the NRS Department, through its then Chair Dr. Husband, requested on April 18, 2003 that the position be offered to Plaintiff as "the next candidate on our list." Pl.'s Ex. C. Dr. Husband also stated that the NRS Department "needs this position filled as soon as possible" and that it is an "important position." Id. Since a search for the position was authorized, it follows that Dean Seemann and the Provost agreed, at least at the outset of the search, that a need existed for the position. Approximately one month after Dr. Husband's request, Plaintiff was notified by letter dated May 20, 2003 that "the search was terminated without filling the position." Pl.'s Ex. S. Other than the rejection of Plaintiff and Dr. David, Defendants do not contend that there was any change in circumstances eliminating the NRS Department's "need" for the position.

The search was not closed immediately upon Dr. Bernhardt's rejection. In fact, there is evidence suggesting that the search and the position remained open for a period, and Plaintiff was considered and rejected by Dean Seemann. At the hearing, Defendants' counsel conceded that it was within the Dean's discretion to offer the position to the second- or third-ranked candidate. At his deposition, Dean Seemann testified that, after Dr. Bernhardt declined, he made a determination not

to offer the position to the remaining <u>two</u> candidates, Plaintiff and Dr. David, which involved "substantial thought and conversation by [him]self and with [his] associates." Pl.'s Ex. P (Seemann Dep. at p. 69). Dean Seemann testified that he concluded that neither Plaintiff nor the third candidate, Dr. David, were qualified for the position. <u>Id.</u> at p. 82. As to Plaintiff, Dean Seemann described his reasons as follows:

> I felt that his caliber as a research scientist was not at the level that I was looking at for new faculty with regard to the hire, and advancing the research capabilities of the College of the Environment and Life Sciences. I felt also that he did not bring sufficient scientific diversity to the Department because of the intertwinings of his research program with those of others in the Department.
>
> * * *
>
> In evaluating his – with particular focus upon his research track record, my assessment of it, its overall impact on the field, its level of creativeness, of being on the cutting edge of bringing the highest level of scientific capability to the University of Rhode Island and the College of the Environment and Life Sciences, that it didn't have the highest level that I thought we should be able to attract to the institution. It was, it is my goal as the Dean to – one of my goals as the Dean to significantly move forward the research capacity, the level of recognition, and the overall quality and success of faculty research, and take it to the next level within the college.
>
> One of the most important ways that I have to do that is through the hiring of new faculty, and to reaching out to get the best and the brightest individuals to come to the University of Rhode Island and take us to that next level where we are, as an institution, competing with other top-flight universities like Duke, like Stanford, like Harvard. That is one of my goals. And as a part of that then, also, an important part of doing that is also, in addition to those characteristics, is also bringing in new talents, new approaches, outside points of view on science. So in this case I also felt, considering all factors, that it was important to reach outside of the Department for the next hire.

<u>Id.</u> at pp. 83-85.

Based on this evidence, a reasonable juror could conclude that Plaintiff and Dr. David were considered for the position shortly after it was declined by Dr. Bernhardt, and they were both rejected. Such a finding would meet the "tailored" fourth prong of Plaintiff's prima facie case of discrimination. In addition, Dean Seemann's explanation of the basis for his decision not to select Plaintiff is sufficient to meet Defendants' burden of articulating a legitimate, non-discriminatory reason for the challenged employment action. See Chapman v. AI Transport, 229 F.3d 1012, 1034 (11th Cir. 2000) ("A subjective reason is a legally sufficient, legitimate, nondiscriminatory reason if the defendant articulates a clear and reasonably specific factual basis upon which it based its subjective opinion.").

**2. Pretext**

The next issue before the Court is whether Plaintiff has adduced sufficient evidence to support a rational finding that Defendants' articulated reason for his non-selection was a pretext and that the real reason for not selecting Plaintiff was his gender. See Shorette v. Rite Aid of Maine, Inc., 155 F.3d 8, 15 (1st Cir. 1998). "Put another way, [Plaintiff] cannot avert summary judgment if the record is devoid of adequate direct or circumstantial evidence of intentional...discrimination on the part of" Defendants. Rodriguez-Cuervos v. Wal-Mart Stores, Inc., 181 F.3d 15, 19-20 (1st Cir. 1999).

This case illustrates the inherent friction between affirmative action efforts and anti-discrimination laws. At the hearing, Defendants' counsel confirmed the well-established principle that state law affirmative action obligations, see R.I. Gen. Laws § 28-5.1-1, et seq., which serve the important goal of increasing the number of qualified minority candidates for consideration, do not "excuse employment discrimination." However, Defendants argue that evidence of their affirmative

action efforts will effectively preclude summary judgment in every reverse discrimination case when a minority candidate is hired over a non-minority candidate. This Court disagrees.

In order to avert summary judgment in an employment discrimination case, a plaintiff may not rely upon "conclusory allegations, improbable inferences, [or] unsupported speculation." Medina-Munoz, 896 F.2d at 8. Thus, Defendants' prediction that they could never receive summary judgment in a reverse discrimination case if this Court follows Eastridge's reasoning, is unfounded. If the employer had undisputable evidence that the faculty position in question was permanently eliminated for budgetary or other academic reasons, or that the plaintiff failed to meet an objective job qualification, then the employer would likely be entitled to summary judgment. However, that is not the case here and Plaintiff is not resting on unsupported speculation. As will be discussed below, Plaintiff has identified sufficient evidence to establish the existence of a "trialworthy" issue of gender discrimination.

As in Eastridge, the outcome of this case will be dictated by an assessment of the credibility of the witnesses. If Defendants' witnesses are believed, qualifications and not gender were the basis for the decision to close the search and thus not hire Plaintiff for the position. If some or all of those witnesses are deemed not credible, then a jury could conclude that gender was a motivating factor in such decision. Under Fed. R. Civ. P. 56, this Court must view all of the evidence in the light most favorable to Plaintiff and draw all reasonable inferences in his favor. Further, the Court's task is not to judge witness credibility but rather to determine if there is a genuine and material factual dispute which "may reasonably be resolved in favor of either party." Maldonado-Denis, 23 F.3d at 581 (emphasis added).

In his opposition, Plaintiff contends that the manner in which Dr. Bernhardt was selected for the final three suggests that Defendants were "stacking the deck" in the favor of the female candidate. The Search Committee initially chose not to select Dr. Bernhardt for an on-campus interview but only did so after its first selection of three males was rejected by the AAO. Defendants counter that the AAO was actually "unstacking the deck" for the benefit of a highly qualified female candidate. Since both conclusions are reasonably supported by the record, the issue must be resolved by a jury.

Second, Plaintiff contends that there is a genuine issue of fact as to his qualifications for the position. As discussed above, Dean Seemann testified that he did not believe that Plaintiff was qualified and explained the reasons for his conclusion at his deposition. Plaintiff has produced evidence that the Search Committee twice selected him for on-campus interviews (Pl.'s Exs. G and H) and that the NRS faculty concluded that he should be ranked second and was considered "acceptable for the position." Pl.'s Ex. I. In addition, Plaintiff produced evidence that he was considered "a close second" to Dr. Bernhardt. Pl.'s Ex. N.

Defendants correctly point out that it is not the function of the courts "to sit as super-tenure committees." Villanueva v. Wellesley College, 930 F.2d 124, 129 (1st Cir. 1991). As the final decision maker, Dean Seemann is not bound by the opinions of the Search Committee or the faculty. Dean Seemann has the discretion to independently assess the qualifications of candidates and, as an accomplished scientist, to hold candidates to a higher standard if he so chooses. Dean Seemann's focus is necessarily broader than that of a search committee or individual faculty member.

Again, the assessment of Plaintiff's qualifications presents a disputed issue of fact for the jury. Plaintiff contends that he was, at least, "a close second" to Dr. Bernhardt and was not selected

due to his gender.[4] Defendants suggest that Plaintiff had a close relationship with the Search Committee Chair and that the assessment of Plaintiff's qualifications may have been inflated due to such relationship and his status as an internal candidate. Since both contentions are equally plausible based on the record, the issue must be resolved by a jury.

Finally, Plaintiff identifies other evidence from which a reasonable juror could draw an inference of discrimination. For instance, Plaintiff points to comments made by Dean Seemann regarding the importance of hiring a woman at a meeting with NRS faculty. See Pl.'s Ex. Q pp. 10-11, 13 and 16. Dean Seemann "reemphasi[zed] the issue of diversity here in hiring a woman for this department" and stated that "[y]ou can't ask for a tenured faculty with all white guys sitting around a table." Id. p. 16.

Plaintiff also points to URI's participation in the National Science Foundation's ADVANCE program. Pl.'s Ex. U. The ADVANCE program's goal is to increase the number of female faculty in the STEM (Science, Technology, Engineering and Math) Departments. Pl.'s Ex. V. In connection with URI's application for ADVANCE program funding from the NSF Department, Dean Seemann offered his support for the program and indicated that "women in the sciences are still clearly underrepresented." Pl.'s Ex. X. URI's initial ADVANCE proposal was made on September 25, 2002. Pl.'s Ex. U. URI was awarded a five-year ADVANCE grant (September 1, 2003 through August 31, 2008) on September 8, 2003. Pl.'s Ex. B2. Under the ADVANCE grant, URI may

---

[4] Plaintiff contends that there are other similar examples of gender discrimination in past searches. For example, Plaintiff submits the Affidavit of Dr. Peter Paton (current NRS Chair). Pl.'s Ex. H2. Dr. Paton testified that he chaired a search committee in 1999 for an NRS faculty position, and the committee ranked a male candidate first. Id., ¶ 6. He testified that a female, and not the male, candidate was selected. Id., ¶¶ 7, 8. Finally, he testified that now-retired Dean William Wright of the College of Resource Development (CELS' forerunner) told him that the female candidate was selected because "upper administration at [URI] would not accept a male candidate and that no candidate except the female candidate would be hired." Id., ¶ 9.

receive up to $3,500,000.00 in funding dependent, in part, upon "an annual review of accomplishments" and URI is required by the terms of the grant to "maintain a uniform database of quantitative indicators of activity and progress" which includes statistics regarding items such as "number and percent of women faculty in science/engineering by department." Pl.'s Ex. B2. Plaintiff argues that the ADVANCE program created a financial disincentive to hire him after Dr. Bernhardt declined the position because his hiring would not further the goals of ADVANCE. Again, it is not the function of this Court under Fed. R. Civ. P. 56 to weigh the evidence. While the goals of ADVANCE are certainly laudable and vital, a reasonable juror could conclude that the program may have contributed to a decision to reject Plaintiff's candidacy based on his gender.

In reaching this conclusion, this Court cannot and has not offered any opinion on the merits of Plaintiff's claim or the credibility of Dean Seemann's explanation for his decision not to select Plaintiff. Rather, when all of the evidence is viewed in a light most favorable to Plaintiff and all reasonable inferences are drawn in his favor, this Court cannot conclude that there are no genuine issues of material fact for trial on the issue of pretext. Thus, this Court recommends that Defendants' Motions of Summary Judgment be DENIED in part as to Plaintiff's claims of gender discrimination under Counts I, II and IV.

**3. Age Discrimination**

Unlike Plaintiff's gender discrimination claim, this Court concludes that there is no "trialworthy" issue as to Plaintiff's age discrimination claim. Plaintiff contends that he was not selected for the position, in part, due to his age (forty-seven). As support for this allegation, Plaintiff points to three allegedly "ageist" comments made by Dean Seemann. However, as discussed below,

these three comments are not sufficient as a matter of law to support any inference of age discrimination in this case.

The three comments were made by Dean Seemann at a meeting between him and members of the NRS faculty. A topic of the meeting was the desire to make an offer of "spousal accommodation" to Dr. Bernhardt. In other words, the desire to sweeten the job offer to Dr. Bernhardt by offering a lectureship position to her husband. Pl.'s Ex. P. (Seemann Dep. at pp. 56-58). It is clear from the transcript of this meeting that none of these comments were directed at Plaintiff or were made in relation to the subsequent decision not to select Plaintiff and close the search. At the time the comments were made, the offer to Dr. Bernhardt was pending, and neither Plaintiff nor Dr. David were under active consideration. For purposes of this litigation, Plaintiff is not challenging the initial decision to offer the position to Dr. Bernhardt. Plaintiff has simply shown no nexus between the claimed "ageist" comments and the decision not to select him for the faculty position in issue. See Ayala-Gerena v. Bristol Myers-Squibb Co., 95 F.3d 86, 96 (1st Cir. 1996) ("stray comments" which are not linked to the challenged employment action held insufficient under Fed. R. Civ. P. 56 to support an inference of age discrimination).

Moreover, only one of the three comments was even related to Dr. Bernhardt, and that comment referred to both Dr. Bernhardt and her husband. In particular, Dean Seemann referred, in his comments, to a "good mentoring community that they're both going to need as young scientists." Pl.'s Ex. Q at p. 31. (emphasis added). The other two comments were directed only at Dr. Bernhardt's husband. Dean Seemann described Dr. Bernhardt's husband as "a really bright young guy" and as having "a really bright young mind." Pl.'s Ex. Q at pp. 28-29. It is undisputed that Dr. Bernhardt and her husband were approximately thirty years old and thus relatively "young." Rather

than "ageist" comments, all three of these comments are merely descriptive and aimed primarily at Dr. Bernhardt's husband, and they do not reasonably suggest any age-based animus toward Plaintiff. See Gonzalez v. El Dia, Inc., 304 F.3d 63, 70 (1st Cir. 2002) (comments "reasonably susceptible to interpretation simply as descriptions" of plaintiff insufficient to support an inference of age-based animus).

Finally, Plaintiff's allegation of age discrimination is undercut by evidence he relies upon in support of his gender discrimination claim. In particular, Plaintiff points to Dean Seemann's decision in April 2005 to hire a female "second choice" candidate, Dr. Laura Myerson, into an NRS Assistant Professor position as evidence supporting an inference of gender discrimination. See Pl.'s Ex. T. Dr. Myerson was forty-three years old at that time and thus only four years younger than Plaintiff was at the time Dean Seemann chose not to hire him. Given the fact that these two candidates (Plaintiff and Dr. Myerson) are relatively close in age, it belies common sense that Dean Seemann had animus towards Plaintiff's age (forty-seven) but not Dr. Meyerson's age (forty-three). See Williams v. Raytheon Co., 220 F.3d 16, 20 (1st Cir. 2000) ("[A]ge difference of less than five years is insufficient to support a prima facie case of age discrimination.").

For the reasons discussed above, the evidence proffered by Plaintiff in support of his age discrimination claim does not meet his burden under Fed. R. Civ. P. 56(e) to establish that there is a genuine issue for trial. Thus, this Court recommends that Defendants' Motions for Summary Judgment be GRANTED in part as to Plaintiff's claims of age discrimination under Counts I, II and III.

## Conclusion

For the reasons stated, I recommend that the District Court DENY Defendants' Motions for Summary Judgment (Document Nos. 44 and 53) as to Plaintiff's gender discrimination claims under Counts I, II and IV, and GRANT such motions as to Plaintiff's claims of national origin discrimination under Counts I, II and IV and age discrimination under Counts I, II and III, and that the District Court DENY URI's Motion to Dismiss (Document No. 50). Any objection to this Report and Recommendation must be specific and must be filed with the Clerk of the Court within ten (10) days of its receipt. Fed. R. Civ. P. 72(b); L.R. CV 72(d). Failure to file specific objections in a timely manner constitutes a waiver of the right to review by the District Court and the right to appeal the District Court's decision. United States v. Valencia-Copete, 792 F.2d 4 (1st Cir. 1990).

LINCOLN D. ALMOND
United States Magistrate Judge
February 3, 2006