**UNITED STATES DISTRICT COURT**
**FOR THE**
**DISTRICT OF RHODE ISLAND**

JOSEF GORRES

vs. C.A. No.: 04-319T

THE UNIVERSITY OF RHODE ISLAND

# PLAINTIFF'S PRETRIAL MEMORANDUM

## I. PARTIES

Josef Gorres, Plaintiff

Trial Counsel, David S. Cass.

The University of Rhode Island and the Rhode Island Board of Governors for Higher Education, Defendants

Trial Counsel, Timothy Dodd and Jeffery Michaelson.

## II. FACTS

The plaintiff, Josef Gorres, is a 49 year-old male. The defendants first hired plaintiff in 1992 as a full time lecturer. Plaintiff was promoted to the position of Assistant Research Professor in the Department of Natural Resources Science in 1994. Plaintiff was promoted to the position of Associate Research in the Department of Natural Resources Science in 1999 after review of accomplishments by his peers, the College department chairs, and the recommendation of the Deans.

In 2002, the defendants determined to fill the then vacant position of Assistant/Associate Professor of Terrestrial Biogeochemistry. Filling the position of

Assistant/Associate Professor of Terrestrial Biogeochemistry was a “high priority”. The department needed the position filled “as soon as possible”. At the time of the search for the position, filling the position was “critical to the research and teaching missions of the department”. In the search for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry the Search Committee met with the NRS Department and the Department made the recommendation to the dean’s office regarding the preferences for hire and that determination was adopted by the Search Committee and forwarded to Dean Jeffrey Seemann on the appropriate form (AA3). The Chair of the Natural Resource Science Department, Dr. Thomas Husband assigned Dr. Jose Amador as the Chair of the Search Committee for the position of Assistant/Associate. The members of the Search Committee for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry were Dr. Allison Roberts, Dr. Kim Brosofske, Dr. Mark Stolt, Dr. Art Gold, Dr. Keith Killingbeck and Dr. Jose Amador. The defendants approved the advertisement for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry on March 5, 2002.

The plaintiff applied for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry. Three candidates were approved, on November 20, 2002, by the Search Committee for on-campus interviews with the three being Dr. Josef Gorres, Dr. Mark David and Dr. John Schade. The Director of Affirmative Action, Equal Opportunity and Diversity, Robert E. Gillis rejected the selection by the Search Committee. The Search Committee re-approved three candidates, on November 26, 2002, for on-campus interviews with the three being Dr. Josef Gorres, Dr. Mark David

and Dr. Emily Bernhardt. The Director of Affirmative Action, Equal Opportunity and Diversity, Robert E. Gillis approved the reselection by the Search Committee.

The Search Committee determined that all of the individuals selected for on-campus interviews, and specifically the plaintiff, were qualified for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry. The Office of Affirmative Action, Equal Opportunity and Diversity determined that all of the individuals selected for on-campus interviews were qualified for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry. The NRS Department determined that all of the individuals selected for on-campus interviews, and specifically the plaintiff, were qualified, by a unanimous vote, for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry.

After the on-campus interviews, the NRS department ranked the candidates with Dr. Emily Bernhardt receiving the highest ranking and Dr. Josef Gorres" a close second." The Request to Hire form was approved by the Affirmative Action Office, the Provost's Office and the Dean's Office on December 30, 2002. The position of Assistant/Associate Professor of Terrestrial Biogeochemistry was offered to Dr. Emily Bernhardt. After Dr. Emily Bernhardt was offered the position of Assistant/Associate Professor of Terrestrial Biogeochemistry, she requested spousal accommodation of having her husband hired into a tenure track faculty position and said request was rejected. The defendants responded to the request for spousal accommodation by Dr. Emily Bernhardt by offering as part of the hire a lectureship for her husband worth an additional $30,000.00 to $40,000.00.

Prior to the offer of the lectureship as spousal accommodation, Dean Jeffrey Seemann and other members of his office met with the NRS Department to discuss the need for spousal accommodation in the offer to Dr. Emily Bernhardt. At the meeting between Dean Jeffrey Seemann and the NRS Department, Dr. Jeffrey Seemann stated:

> We haven't indicated anything outside the ordinary (inaudible). We believe first of all that -- that a competitive university needs a spousal hire policy that would accommodate situations like this, and particularly, when we are in the process of trying to be extraordinarily competitive to hire a woman into this department. I cannot emphasize the importance of that. Not to use too many -- to hiring her and keeping her here.
>
> * * *
>
> And I will also then reemphasize the issue of diversity here in hiring a woman for this department.
>
> * * *
>
> You can't -- I don't know why you have not been successful several times in a row, but you can't not be successful here. You really --- you can't. You can't ask for a tenured faculty with all white guys sitting around a table. You really can't, and I think – I don't have to tell you why.

At the meeting between Dean Jeffrey Seemann and Associate Dean Cathy Roheim and the NRS Department, Dr. Roheim stated:

> but keeping Emily is another big issue, and this plays into that, and you know, for a variety of reasons which as far as I know are not under your control at all, you've, you know, in the time I've been here, you have had three different women faculty, all of whom have left for one reason or another and it sure would be nice to have one get through the tenure process and be here.

Dr. Emily Bernhardt declined the offer of the position of Assistant/Associate Professor of Terrestrial Biogeochemistry on or before April 17, 2003. Once Dr. Emily Bernhardt declined the position of Assistant/Associate Professor of Terrestrial Biogeochemistry, Dr. Thomas Husband, Chair of the NRS Department stated to Dean Seemann that the search resulted in three highly qualified candidates and requested Dean

Seemann to make an offer to the next candidate on the list. Dr. Keith Killingbeck, a member of the Search Committee, requested to speak to Dean Seemann to offers reasons why Dr. Josef Gorres should be hired into the position and Dean Seemann did not accept the offer to meet with Dr. Killingbeck. After Dr. Emily Bernhardt declined the position of Assistant/Associate Professor of Terrestrial Biogeochemistry, the position remained open and Dean Seemann recommended not to hire the remaining candidates and to close the search.

The plaintiff was notified by letter, dated May 20, 2003, that the search was terminated without filling the position, that the search was closed. The Request to Form for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry ranked plaintiff second and stated that the plaintiff was "Less experienced in research on plant-soil/landscape interactions" than the selected candidate. Dean Jeffrey Seemann stated after commencement of the claim by the plaintiff that the plaintiff was not qualified for the position because he was not "on the cutting edge of bringing the highest level of scientific capability to the University of Rhode Island". Dean Jeffrey Seemann in a hire for the position of Assistant Professor, Habitat Restoration Ecology, in 2004, hired the second ranked candidate, a woman, who, per the Request to Hire form had "Research experience not as strong as the selected candidate."

**ADVANCE Grant**

The University of Rhode Island, beginning some time prior to September 25, 2002 began, by and through its employees, certain faculty and staff, to produce a proposal to the National Science Foundation (NSF) with the title of the proposed project being

"ADVANCE Institutional Transformation Award: A Change in the Culture at the University of Rhode Island. The proposal (ADVANCE) to the NSF requested the amount of $3,749,647 for the 60 months starting on 04/01/03, approximately $750,000 per year. The proposal (ADVANCE) to the NSF was dated Sept 25 2002. The ADVANCE program's goal was and is to substantially increase the number of ranked women faculty in the STEM departments with STEM being science, technology, engineering and math. Dean Seemann, at the time of the search for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry, was fully aware of the ADVANCE proposal and had written in support of the ADVANCE Institutional Transformation Program proposed. Provost and Vice President for Academic Affairs, Beverly Swan, at the time of the search for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry, was fully aware of the ADVANCE proposal and had written in support of the ADVANCE Institutional Transformation Program proposed. Dr. Cathy Roheim who was at the time of the search for the position of Assistant/Associate Professor of Terrestrial Biogeochemistry an Associate Dean in Dean Seemann's Office was aware of and subsequently directly involved in the ADVANCE program. The ADVANCE program requires, for multi-year grants, annual reporting at least 90 days before the end of the annual budget. Pursuant to the Cooperative Agreement between the NSF and the University of Rhode Island, the University of Rhode Island must maintain a uniform database of quantitative indicators of activity and progress including the number and percent of women faculty in science/engineering by department. Pursuant to the Cooperative Agreement between the NSF and the University

of Rhode Island, the level of continuing NSF support will be negotiated with the University of Rhode Island annually and continuation of NSF support will depend upon an annual review of accomplishments, availability of funds, and scientific progress towards the goals of the project.

**Custom In Hiring Process.**

The defendant University of Rhode Island produced in discovery the following documentation:

a. all documentation pertaining to any position search where the "Selected" candidate, as listed on the University of Rhode Island Request to Hire form (Form AA3) refused/declined the offer of the position from January 1, 2000 through the present for academic positions comparable to the position sought by the plaintiff.

b. all documents pertaining to any position search where the search was concluded without a hire from January 1, 2000 through the present for academic positions comparable to the position sought by the plaintiff.

c. all documents relating or pertaining to any position search where an applicant for the position was an internal candidate from January 1, 2000 through the present for academic positions comparable to the position sought by the plaintiff.

Plaintiff, Josef Gorres, has reviewed all of the documentation regarding position searches wherein the "selected" candidate did not accept the offer of employment and/or the search "failed". Plaintiff, Josef Gorres, has compiled a summary of the outcomes of the searches for which documentation was produced. There were 58 position searches covered by the documents produced by the defendants. Of those searches, 29 were

concluded by hiring a subsequently ranked candidate (19 hires of the second ranked candidate, 7 hires of the third ranked candidate, 1 hire each of the fourth and fifth ranked candidate) and 28 searches failed. In those searches that failed 11 failed after the first candidate declined and offers were made to subsequent candidates who subsequently declined. In 13 cases, withdrawals and determinations by the search committee or the department left no qualified, interviewed candidates after the top candidate declined. In 3 failed searches, the search committee or department determined that none of the applicants were qualified. In 2 failed searches, the search committee or the department did not make the determination of a failed search. In one of these two searches, financial reasons may have played a role. The other search was the search for a Terrestrial Biogeochemist, the position Dr. Gorres had applied for.

**<u>Prior Acts Of Gender Motivation</u>**

**Hire of Bridget Ruemmele.**

The University of Rhode Island, in 1991, hired Dr. Bridget Ruemmele, a female, into the position of Assistant/Associate Professor, Turfgrass Improvement. Dr. Ruemmele was not the first ranked candidate as determined by the Search Committee and as presented on the Request to Hire form and as admitted by the Dean of the College. Dean Miller's selection of Bridget Ruemmele for the position was motivated by "affirmative action reasons". Dr. Richard Casagrande told Bridget Ruemmele, during her interview process as an applicant for the position of Assistant/Associate Professor, Turfgrass Improvement, that unless they could find something wrong with her they had to hire her because she was a woman.

**Hire of Kimberley Brosofske.**

The University of Rhode Island, in 2000, hired Dr. Kimberley Brosofske, a female, into the position of Assistant Professor, Forest Ecologist. Dr. Peter Paton was the Chair of the search Committee for the hire for the position of Assistant Professor, Forest Ecologist. During the course of the search for the position of Assistant Professor/Forest Ecologist, the search committee concluded that Dr. John Lichter, a male candidate, was the best candidate for the position. Dr. Kimberley Brosofske was the listed first choice and selected candidate for the position of Assistant Professor/Forest Ecologist. Dr. John Lichter was not placed as the selected candidate and Dr. Kimberley Brosofske was placed as the selected candidate because William Wright, the Dean of the College of Resource Development, stated to Dr. Peter Paton that the upper administration at the University of Rhode Island would not accept a male candidate and that no candidate except the female candidate would be hired. Dr. Kimberley Brosofske was the selected candidate on the University of Rhode Island Request to Hire form for the position of Assistant Professor/Forest Ecologist solely due to the requirement placed by the dean that a female was to be the selected candidate.

**Non-hire for position of Assistant or Associate Professor, Victor J. Baxt Chair.**

In 2000, the University of Rhode Island sought to hire into the position of Assistant or Associate Professor, Victor J. Baxt Chair. The search for the position of Assistant or Associate Professor, Victor J. Baxt Chair, resulted in Shelley L. Anna, a woman, being ranked first, Peter J. Ludovice, a man being ranked second and David C. Venerus, a man, being ranked third. All

three candidates listed on the AA3 form for the position of Assistant or Associate Professor, Victor J. Baxt Chair were deemed highly qualified and eminently suited to hold the Victor J. Baxt Chair. The first and second candidates for the position of Assistant or Associate Professor, Victor J. Baxt Chair declined the offer of the position. The position of Assistant or Associate Professor, Victor J. Baxt Chair was subsequently offered to the third ranked candidate, David C. Venerus. While an offer was pending to David C. Venerus, the Provost for the University of Rhode Island determined that the position was unable to be filled and included in her reasoning the need for diversity. The provost's action of extending the search with a pending qualified candidate caused such concern regarding the propriety of the provost's action that the Affirmative Action Office and Human Resources for the University requested the chair of the search committee to consult with the University's counsel to make sure that the actions had not exposed the University from a legal perspective.

## III. CLAIMS AND DEFENSES

Plaintiff asserts a claim of gender discrimination in the defendant's refusal to hire him into a position for which he applied. Plaintiff asserts that this denial violated 42 USC §§ 2000e-2(a)(1) and 2000e-2(m):

> (a) Employer practices
>
> It shall be an unlawful employment practice for an employer —
>
> (1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin;
>
> * * *
>
> (m) Impermissible consideration of race, color, religion, sex, or national origin in employment practices

Except as otherwise provided in this subchapter, an unlawful employment practice is established when the complaining party demonstrates that race, color, religion, sex, or national origin was a motivating factor for any employment practice, even though other factors also motivated the practice.

Plaintiff further asserts that the defendant's denial violated Rhode Island General Laws §§ 28-5-7(1)(i) and 42-112-1, et seq.:

**§ *28-5-7* Unlawful employment practices. —**

It shall be an unlawful employment practice:

(1) For any employer:

(i) To refuse to hire any applicant for employment because of his or her race or color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin.

**§ *28-5-7.3* Motivation for discriminatory practice — Evidence.**

An unlawful employment practice may be established in an action or proceeding under this chapter when the complainant demonstrates that race, color, religion, sex, sexual orientation, gender identity or expression, disability, age, or country of ancestral origin was a motivating factor for any employment practice, even though the practice was also motivated by other factors. Nothing contained in this chapter shall be construed as requiring direct evidence of unlawful intent or as limiting the methods of proof of unlawful employment practices under § 28-5-7.

**§ *42-112-1* Discrimination prohibited. —**

All persons within the state, regardless of race, color, religion, sex, disability, age, or country of ancestral origin, have, except as is otherwise provided or permitted by law, the same rights to make and enforce contracts, to inherit, purchase, to lease, sell, hold, and convey real and personal property, to sue, be parties, give evidence, and to the full and equal benefit of all laws and proceedings for the security of persons and property, and are subject to like punishment, pains, penalties, taxes, licenses, and exactions of every kind, and to no other.

Defendants deny any discriminatory intent as either a "because of" (determinative) factor or a motivating factor. The defendants further claim that the University of Rhode Island is not a legal entity and that the Board of Governors is an improper party as it was not included as a named party in the administrative proceedings before the Equal Employment Opportunity Commission and Rhode island Commission for Human Rights.

## IV. DAMAGES

Plaintiff seeks an order of this court that the defendants must hire the plaintiff into the position to which he should have been hired. Alternatively, Plaintiff would seek front pay and an injunction ordering the defendants to cover any gap between his income and what his income and benefits would have been had he received the position through to his retirement.

Plaintiff seeks an award of back pay and benefits as follows:

| | |
|---|---|
| Back Wages:<br>(contract salary minus income actually earned) | $69,373 |
| Health Insurance up to 2005: | $ 5,355 |
| Pension Contributions up to 2005: | $ 5,980 |
| Benefits 2005-2006 | $ 6,331 |

Plaintiff asserts that these damages are continuing.

Plaintiff seeks an award of attorney's fees.

## V. ISSUES

1. Plaintiff's claims of discrimination under U.S. Code and Rhode Island Statutes, cited and quoted above. Plaintiff asserts both a single motive and a mixed motive claim of discrimination.

2. Plaintiff asserts that a claim of mixed motive discrimination, 42 USC 200e-2(m), does not require "direct evidence" and solely requires a showing by a preponderance of the evidence without any evidentiary threshold. *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003)

3. Defendant's claim that the University of Rhode Island is not a proper party before this Court. After discussion with Defendants' counsel, it is believed that this issue will not be presented at trial except to preserve the issue as presented in the Defendants' dispositive motions.

4. Defendant's claim that the defendant Board of Governors was not properly named in the administrative proceedings before the Equal Employment Opportunity Commission and Rhode Island Commission for Human Rights. After discussion with Defendants' counsel, it is believed that this issue will not be presented at trial except to preserve the issue as presented in the Defendants' dispositive motions.

5. The defendants object to the plaintiff's proffered evidence relating to custom in hiring and the hires of Dr. Ruemmele and Dr. Brosofske and the non-hire for the position of Assistant or Associate Professor, Victor J. Baxt Chair. Plaintiff asserts that all proffered evidence is appropriate, relevant and probative of the issues presented before this Court.

## VI. ARGUMENTS AND DISCUSSION

### 1. Discrimination

Plaintiff asserts that arguments and discussion are contained and addressed in the parties' memoranda regarding the dispositive motions filed with this Court. Plaintiff further asserts that the charge to the jury that needs be addressed by the Court is whether the jury should receive a mixed-motive charge and attendant affirmative defense and/or a single-motive charge. See *Desert Palace, Inc. v. Costa*, 539 U.S. 90 (2003) and *Desert Palace, Inc. v. Costa*, 299 F. 3d 838 (9th Cir.. 2002), *aff'd*, 539 U.S. 90, 123 S.Ct. 2148 (2003).

As addressed in *McDonnell Douglas v. Green,* 411 U.S. 792 (1973), the *prime facie* case for discrimination was established as a showing that the plaintiff (i) belongs to a protected class; (ii) that he applied and was qualified for a job for which the employer was seeking applicants; (iii) that, despite his qualifications, he was rejected; and (iv) that, after his rejection, the position remained open and the employer continued to seek applicants from persons of complainant's qualifications. *McDonnell Douglas v. Green,* 411 U.S. 792, 802 (1973).

Plaintiff asserts that although this structure is applicable to pretrial motions, the actual standard at trial is much less structured and basic to the question established by the statutes.

> The inquiry is simply that of any civil case: whether the plaintiff's evidence is sufficient for a rational fact finder to conclude by a preponderance of the evidence that the employer violated the statute — that "race, color, religion, sex, or national origin was a motivating factor for any employment practice.

*Desert Palace, Inc. v. Costa,* 299 F.3d 838, 848 (citations omitted).

In support of the asserted inquiry, Plaintiff presents the Ninth Circuit Court's discussion of the inquiry in *Desert palace v. Costa*:

It is important to emphasize, however, that nothing compels the parties to invoke the *McDonnell Douglas* presumption. Evidence can be in the form of the *McDonnell Douglas* prima facie case, or other sufficient evidence — direct or circumstantial — of discriminatory intent. Thus, although *McDonnell Douglas* may be used where a single motive is at issue, this proof scheme is not the exclusive means of proof in such a case. Indeed, it also might be invoked in cases in which the defendant asserts a "same decision" defense to certain remedies, a circumstance in which mixed motives are at issue.

Regardless of the method chosen to arrive at trial, it is not normally appropriate to introduce the *McDonnell Douglas* burden-shifting framework to the jury. At that stage, the framework unnecessarily evades the ultimate question of discrimination *vel non*.

Once at the trial stage, the plaintiff is required to put forward evidence of discrimination "because of" a protected characteristic. After hearing both parties' evidence, the district court must decide what legal conclusions the evidence could reasonably support and instruct the jury accordingly. This determination is distinct from the question of whether to invoke the *McDonnell Douglas* presumption, which occurs at a separate, earlier stage of proceedings, involves summary judgment rather than jury instructions, and is unrelated to the number of possible motives for the challenged action. Instead, the choice of jury instructions depends simply on a determination of whether the evidence supports a finding that just one — or more than one — factor actually motivated the challenged decision. Justice White, in his concurring opinion in *Price Waterhouse*, succinctly described how the type of evidence presented affects the question facing the jury:

> In [single-motive] cases, "the issue is whether either illegal or legal motives, but not both, were the `true' motives behind the decision." In mixed-motive cases, however, there is no one "true" motive behind the decision. Instead, the decision is a result of multiple factors, at least one of which is legitimate.

Following the 1991 amendments, characterizing the evidence as mixed-motive instead of single-motive results only in the availability of a different defense, a difference which derives directly from the statutory text, not from judicially created proof structures.

As a practical matter, the question of how many motives the evidence reasonably supports affects the jury instructions as follows:

> If, based on the evidence, the trial court determines that the only reasonable conclusion a jury could reach is that discriminatory animus is the sole cause for the challenged employment action or that discrimination played no role at all in the employer's decision making, then the jury should be instructed to determine whether the

> challenged action was taken "because of "the prohibited reason. If the jury determines that the employer acted "because of" discriminatory intent, the employee prevails and may receive the full remedies available under Title VII; if not, the employer prevails. In such cases the employer does not benefit from the "same decision" defense, which, if successful, significantly limits the employee's remedies.

In contrast, in cases in which the evidence could support a finding that discrimination is one of two or more reasons for the challenged decision, at least one of which may be legitimate, the jury should be instructed to determine first whether the discriminatory reason was "a motivating factor" in the challenged action. If the jury's answer to this question is in the affirmative, then the employer has violated Title VII. However, if the jury then finds that the employer has proved the "same decision" affirmative defense by a preponderance of the evidence, 42 U.S.C. § 2000e-5(g)(2)(B), the employer will escape the imposition of damages and any order of reinstatement, hiring, promotion, and the like, and is liable solely for attorney's fees, declaratory relief, and an order prohibiting future discriminatory actions.

Regardless of what kind of instructions are given, we emphasize that there are not two fundamentally different types of Title VII cases. In some cases, the employer may be entitled to the "same decision" affirmative defense instruction. In others, it may not. The employee's ultimate burden of proof in all cases remains the same: to show by a preponderance of the evidence that the challenged employment decision was "because of" discrimination.

Finally, we turn to the question of where the concept of pretext fits in this framework. Although cases in which the *McDonnell Douglas* framework is applied are sometimes referred to as "pretext cases," and we have no wish to change a quarter century of usage, it should be noted that questions of pretext may arise in any Title VII case, regardless of whether it is analyzed under *McDonnell Douglas*. Cases in which the dispute is only over whether or not the employer possessed the discriminatory motive alleged need not involve pretext, although they often do. For example, if the plaintiff chooses not to invoke the *McDonnell Douglas* framework, the employer need not proffer any explanation for the challenged action, but may simply require the plaintiff to prove her case of discrimination. Nor is the concept of pretext alien to cases in which an employer asserts a "same decision or "but for" defense. For example, one of the employer's purportedly legitimate reasons may be pretextual. On the other hand, another may not. As Justice O'Connor recently explained in writing for the Court: "Proof that the defendant's explanation is unworthy of credence is simply one form of circumstantial evidence that is probative of intentional discrimination. . . ."

To summarize: *McDonnell Douglas* and "mixed-motive" are not two opposing types of cases. Rather, they are separate inquiries that occur at separate

> stages of the litigation. Nor are "single-motive" and "mixedmotive" cases fundamentally different categories of cases. Both require the employee to prove discrimination; they simply reflect the type of evidence offered. Where the employer asserts that, even if the factfinder determines that a discriminatory motive exists, the employer would in any event have taken the adverse employment action for other reasons, it may take advantage of the "same decision" affirmative defense.

*Id*. at 854-57 (internal quotations and citations omitted)

**2. URI as a proper Party**

The Defendant University of Rhode Island asserts that the term "University of Rhode Island" is a fictitious name, not a legal entity. The University further asserts that it is operated by the Rhode Island Board of Governors for Higher Education that is the legal entity that may sue and be sued. Based on these asserted facts, the University argues that it cannot be named as a party in this action. The University's position is at odds with the reality in which the University has operated for decades, up until the assertion in this case that it could not be sued, as it is a fictitious name for the Board of Governors. As was presented to this court in oral argument on plaintiff's Motion to Amend the complaint to add as a defendant the Board of Governors for Higher Education, the University has for decades repeatedly sued and been sued in both the Rhode Island and Federal Courts[1]. In fact, the University has been sued twice with actions filed in this Court by plaintiff's

---

[1] See, *Gorman v. University of Rhode* Island, 837 F.2d 7 (1st Cir. 1988); University *of Rhode Island v. Chesterton, 2 F.3d 1200 (1st Cir. 1993); University of Rhode Island v. Chesterton*, 721 F. Supp. 400 (R.I. 1989); *Lallemand v. University of Rhode Island*, 9 F.3d 214 (1st Cir. 1993); *University of Rhode Island v. University of Rhode Island Chapter of the American Association of University Professors*, Rhode Island Superior Court Case No. 2000-5007; *University of Rhode Island v. Dept. of Employment and Training*, 691 A.2d 552 (R.I. 1997); *Wilkinson v. University of Rhode Island*, Rhode Island Superior Court Case No. 2003-0573; *Chang v. University of Rhode Island*, 118 R.I. 631 (1977).

counsel asserting discrimination.[2] In each of these cases the University was named before the administrative agencies and not the Board of Governors.[3] Both times, counsel for the Board of Governors defended the action and failed to raise any issue as to the University as a party before this court.[4] Additionally, as produced in discovery, the University has entered into a contract[5] in its name, not that of the Board of Governors. It is disingenuous for the University to sue, be sued, enter into contracts and then assert that it cannot be a proper party before this Court.

Plaintiff incorporates by reference conclusions of the Recommendation and Report of the magistrate on the defendant's dispositive motions.

**3. Board of Governors was not properly named in the administrative proceedings**

The defendant Board of Governors asserts, based on the fact that the administrative proceedings before the Equal Employment and Opportunity Commission (EEOC) and the Rhode Island Commission for Human Rights (RICHR) failed to name the Board of Governors, that it is not an available party for liability due to a failure to exhaust the administrative remedies required by Title VII and the Rhode Island Fair Employment Practices Act (FEPA).

---

2 See, *Hawksley v. The University of Rhode Island*, D.R.I., 03-312T; *Christine King v. The University of Rhode Island*, D.R.I., 02-183 ML.

3 *Id.*

4 *Id.*

5 Plaintiff asserts that this contract as part of the AVANCE program is likely not the sole contract entered into by the university.

Plaintiff filed his charge with the EEOC and RICHR against the University of Rhode Island and had at that time the assistance of counsel. Neither the University nor the Board of Governors raised any issue with the naming of the respondent before the Rhode Island Commission for Human Rights. By the statutory structure asserted by the University of Rhode Island and the Board of Governors, General Counsel is an agent and representative of the Board of Governors. In all respects, the Board of Governors has acted as if all claims against the University of Rhode Island were claims against the Board of Governors, identical in practice.

The purpose of requiring an aggrieved party to resort first to the EEOC is to ensure that the defendant has notice and to provide an avenue for voluntary compliance without resort to litigation. *McKinnon v. Kwong Wah*, 83 F.3d 498, 505 (1st Cir. 1996), citing *Curran v. Portland Super. Sch. Committee*, 435 F. Supp. 1063 (D. Maine 1977); *Glus v. G.C. Murphy Co.*, 562 F.2d 880, 888 (3rd Cir. 1977) citing *Le Beau v. Libby-Owens-Ford Co.*, 484 F.2d 798, 799 (7th Cir. 1973); *Fekete v. U.S. Steel Corp.*, 424 F.2d 331, 334; and *Bowe v. Colgate-Palmolive Co.*, 416 F.2d 711 (7th Cir. 1969). As stated in *Kwong Wah* and *Glus*, there are four factors to consider in determining whether an unnamed party in the EEOC charge may still properly be a defendant in a subsequent Title VII action:

> 1) whether the role of the unnamed party could through reasonable effort by the complainant be ascertained at the time of the filing of the EEOC complaint; 2) whether, under the circumstances, the interests of a named are so similar as the unnamed party's that for the purpose of obtaining voluntary conciliation and compliance it would be unnecessary to include the unnamed party in the EEOC proceedings; 3) whether its absence from the EEOC proceedings resulted in actual prejudice to the interests to the

> unnamed party; 4) whether the unnamed party has in some way represented to the complainant that its relationship with the complainant is to be through the named party.

*Kwong Wah*, supra, at 505; *Glus*, supra, at 888.

The factors set forth by *Glus* have been met and naming of the Board of Governors as a defendant is appropriate.

**4. Evidentiary Issues**

Plaintiff has been made aware that the defendants will take issue with the evidence proffered as set forth in the facts above (Custom in Hiring Process and Prior Acts of Gender Discrimination). Plaintiff has not been informed as to the exact nature of the objections. However, plaintiff asserts that the proffered evidence is relevant and its probative value is not substantially outweighed by the danger of unfair prejudice and in all respects comply with the applicable rules of evidence.

## VII. PENDING MATTERS

Plaintiff believes that the only pending matter is an update by the defendants of their responses to discovery to cover the period from the last production of documents through the present.

## VIII. TRIAL TIME

Plaintiff anticipates the trial in this matter to last 5-7 days.

## IX. VOIR DIRE

Plaintiff requests the Court inquire of the prospective jurors regarding the following issues:

1. Whether any of the prospective jurors has in any way been involved in any discrimination claim either as a party or a witness and if so, separate questioning individually as to the particulars regarding their involvement.

2. Whether any of the prospective jurors has any knowledge of any discrimination claim by or against anyone they know or at any place of employment where they work or have worked and if so, separate questioning individually as to the particulars regarding their involvement.

3. Their understanding of the requirements of affirmative action procedures and their belief in the need and application of these requirements.

4. Their belief and feelings in the effects of affirmative action procedures.

5. Their connections to or relationship with the defendants both directly and any connection of anyone that they know.

Respectfully submitted:
JOSEF GORRES
By and through his attorney

/s/ David S. Cass
David S. Cass, #5044
194 Waterman Street
Providence, RI 02906
(401) 272-2627
Fax: (401) 272-2708